UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES COLEMAN, et al., | No. 2:17-cv-00655-TLN-DMC |
| Plaintiffs, | |
| v. | **ORDER** |
| COUNTY OF SHASTA, et al., | |
| Defendants. | |

This matter is before the Court on Defendants County of Shasta ("County"), Deputy Tim Estes ("Estes"), and Deputy Gary Nunnelly's ("Nunnelley") (collectively, "Defendants") Motion for Summary Judgment.  (ECF No. 35.)  Plaintiffs James Coleman ("Coleman") and MC Health & Wellness Center, Inc. ("MC Health") (collectively, "Plaintiffs") filed an opposition.  (ECF No. 37.)  Defendants filed a reply.  (ECF No. 39.)  For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants' motion.

///
///
///
///
///
///

1

1          **I.      FACTUAL BACKGROUND**[1]

2          Coleman resides on property in Shasta County, California.  (ECF No. 37-1 at 3.)  The

3  property is in a remote wooded area and consists of two adjoining lots, which are each 20 acres.

4  (*Id.*)  The southern lot fronts the road, while the northern lot is in the back.  (*Id.*)  There is an

5  unpaved gravel easement that cuts across a corner of the southern lot to access the northern lot.

6  (*Id.*)  Wayne Schooley formerly owned both lots.  (*Id.*)  In 2000 or 2001, Coleman purchased the

7  northern lot from Wayne Schooley.  (*Id.*)  Wayne Schooley retained the southern lot and granted

8  Coleman an easement to cross the southern lot so he could access the northern lot.  (*Id.*)  Coleman

9  asserts that Wayne Schooley maintained a separate road to access the southern lot for the

10  following 13 years and told Coleman that he had exclusive use of the gravel easement road to the

11  northern lot.  (*Id.*)  Coleman further asserts Wayne Schooley gave him the locked gate on the

12  easement road.  (*Id.*)

13          In 2014, Wayne Schooley gave the southern lot to his son, Robert Schooley, and his wife,

14  Pamela.  (*Id.* at 4.)  Robert and Pamela Schooley (the "Schooleys") drove to the property in their

15  recreational vehicle ("RV"), which they planned on living in while they built a house.  (*Id.*)

16  Coleman disputes this fact by stating that the Schooleys originally told him they were only

17  camping and would not be staying long.  (*Id.*)  When the Schooleys arrived at the property, there

18  was a gate secured with a chain and a lock blocking the easement.  (*Id.*)  Coleman indicates the

19  separate road that Wayne Schooley formerly maintained was too overgrown to accommodate the

20  Schooley's larger RV, so Coleman opened the gate for the Schooleys.  (*Id.*)

21          Over the next several years, the Schooleys and Coleman had numerous verbal altercations,

22  at least some of which arose out of the shared use of the easement.  (*Id.*)  On multiple occasions,

23  Coleman put a lock on the gate.  (*Id.*)  Each time, Robert Schooley would cut the lock off.  (*Id.*)

24          On July 6, 2016, Robert Schooley left his property to go to work.  (*Id.* at 5.)  When he

25  returned home later that day, a new lock had been placed on the gate.  (*Id.*)  Robert Schooley

26  decided that rather than cut the lock off, he would contact the Sheriff's Department.  (*Id.*)  A short

27

28  [1]      The following facts are undisputed unless otherwise noted.

1    time later, Estes and Nunnelley were dispatched to the scene.  (*Id.*)  The deputies parked on the

2    street next to the gated driveway.  (*Id.*)  The gate was locked, and there was a sign on the gate for

3    a medical marijuana collective.  (*Id.*)

4         Robert Schooley met the deputies at the locked gate.  (*Id.*)  He identified himself as the

5    person who called for assistance and as the owner of the southern lot that fronted the road.  (*Id.*)

6    Robert Schooley told the deputies that his RV and other possessions were just inside the gated

7    access of the driveway, and these possessions were visible from the road.  (*Id.*)  Robert Schooley

8    also told the deputies that his neighbor had an easement to use the driveway so that he could

9    access his lot in the back.  (*Id.* at 5–6.)  When Robert Schooley asked the deputies if they would

10   remove the lock, Estes responded that he could not do that because this was a neighbor dispute,

11   and he was not permitted to cut a lock on a gate on private property unless there was an

12   emergency.  (*Id.* at 6.)  Robert Schooley did not want to cut the lock as it appeared to be too

13   strong for bolt cutters, so he instead took the gate off the hinges and removed it.  (*Id.*)

14        The parties dispute almost everything about what happened next.  The Court will address

15   the parties' differing version of events in turn.

16                      A.      Defendants' Version of Events

17        After Robert Schooley removed the gate, Estes offered to talk to Coleman to see if there

18   was a way to resolve the dispute.  (*Id.* at 7.)  Robert Schooley accepted the offer and invited the

19   deputies onto the property.  (*Id.*)  When they arrived at the end of the driveway on Coleman's

20   property, the deputies exited their vehicles and observed two structures that appeared to be a

21   house and barn or shop.  (*Id.* at 8.)  Estes walked up to the front door of the house and knocked on

22   the door.  (*Id.* at 9.)  Nunnelley, who was standing in the driveway, observed a side or rear yard

23   area that was to the south and east of the structures.  (*Id.*)  Nunnelley walked to that area, peered

24   around the structure, and walked a few paces into the open yard.  (*Id.* at 9–10.)  Nunnelley

25   indicated he was checking the yard to make sure there were no safety threats, as he knew in his

26   experience responding to calls in Shasta County that property owners in rural areas typically have

27   dogs and/or firearms.  (*Id.* at 9.)  Nunnelley observed a green tarp covering an area on the other

28   side of some berry bushes and what appeared to be tops of marijuana plants.  (*Id.* at 10.)

Nunnelley also smelled marijuana in the air, which grew stronger as he walked toward the berry bushes.  (*Id.*)  Nunnelley then joined Estes at the front door of the home.  (*Id.*)

A short while later, Coleman emerged from the home.  (*Id.* at 11.)  After some discussion about the easement dispute, Nunnelley asked Coleman if he was growing marijuana on the property.  (*Id.* at 12.)  Coleman responded that he grows marijuana for a medical marijuana collective of 17 people and showed the deputies a medical marijuana recommendation card.  (*Id.*)  Nunnelley asked Coleman if he was growing marijuana indoors and outdoors and he responded "yes" to both.  (*Id.*)  Nunnelley then asked Coleman if he would show them the inside of the shop.  (*Id.*)  Coleman responded that he would and led the deputies into the shop.  (*Id.*)  While inside, the deputies observed several dozen marijuana plants and "clones" (which are small marijuana plants clipped from a larger plant and planted into separate pots) growing inside the two grow rooms.  (*Id.*)  Nunnelley counted 80 plants and 175 clones inside the structure.  (*Id.*)  Nunnelley then asked Coleman if he would show him the outdoor grow area, and Coleman responded that he would.  (*Id.* at 12–13.)  They exited the shop, and Coleman pointed in the direction of the berry bushes and told Nunnelley that the grow was through the fence.  (*Id.* at 13.)  Nunnelley walked to the outdoor grow area and observed a total of 43 outdoor plants.  (*Id.*)

Nunnelley then returned and informed Coleman that he was out of compliance with the Shasta County Ordinance related to growing marijuana.  (*Id.*)  Defendants cite Shasta County Ordinance 2014-2, which prohibited the outdoor cultivation of marijuana on any property and deemed it a public nuisance.[2]  (*Id.* at 2.)  The Ordinance also limited the total number of plants that could be grown indoors on any premises to a total of 12 plants.  (*Id.* at 3.)

---

[2]      Defendants request the Court take judicial notice of the Shasta County Code and Ordinances (Exhibits One through Three) and 2014 election data (Exhibit Four).  (ECF No. 35-2.)  Plaintiffs do not oppose.  Under Federal Rule of Evidence 201, facts appropriate for judicial notice are those "not subject to reasonable dispute" that are either "(1) [] generally known within the trial court's jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Defendants' exhibits are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *Id.*  Therefore, the Court GRANTS Defendants' request for judicial notice.

1   Nunnelley told Coleman that he was going to refer the matter to the District Attorney for

2   violations of the Ordinance.  (*Id.* at 13.)  Deputy Estes and Deputy Nunnelley took photographs

3   and collected samples of the marijuana plants as evidence.  (*Id.*)  For the plants that were not

4   taken for evidentiary purposes, Nunnelley removed them from the ground or from the pots they

5   were in and left them on the property.  (*Id.*)

6   B.      Coleman's Version of Events[3]

7   According to Coleman, the deputies entered his property, not to diffuse the neighbor

8   dispute, but to execute a warrantless search and seizure because they had information that he was

9   a Black man illegally growing marijuana.  (*Id.* at 7.)  Coleman saw the deputies first arrive at his

10   home on security monitors.  (ECF No. 37-4 at 6.)  Coleman then yelled to the deputies, "How did

11   you get through my locked gate?"  (*Id.*)  In response, Estes told Coleman his neighbors had

12   removed the gate to give them access to Coleman's property.  (*Id.*)  Coleman told the deputies he

13   wanted the neighbors charged for vandalizing the gate, to which Estes responded they were "not

14   here for that" and instead had come about "marijuana being grown on the property."  (*Id.*)  At this

15   point, Nunnelley started going around the side of Coleman's house while Estes questioned

16   Coleman.  (*Id.*)  Coleman states there would not have been a smell of marijuana in the air because

17   the plants were too immature to "stink" and the marijuana plants behind the berry bushes were

18   not visible without poking or walking around the bushes.  (*Id.* at 6–7.)

19   When Nunnelley came back, both deputies started pressuring Coleman about marijuana

20   on the property.  (*Id.* at 7.)  Coleman states he neither consented to the search nor made any

21   statements that could be reasonably understood as consent to search the property.  (*Id.*)  Coleman

22   states he believed he had no choice but to follow the deputies' subsequent direction to show him

23   around inside the shop area.  (*Id.* at 7–8.)  After the deputies went to the shop area, Nunnelley left

24   for a brief period and returned.  (*Id.* at 8.)  Nunnelley then told Coleman he was out of

25   compliance with the Shasta County Ordinance and that he was going to refer the matter to the

26   District Attorney.  (*Id.*)

27

28   [3]      Defendants object to certain portions of Plaintiffs' evidence.  (ECF No. 39-1.)  The Court will only address evidentiary objections that are material to its ruling herein.

5

1    Coleman states that after photographing the plants and taking some samples, the deputies

2    began destroying some of the marijuana plants.  (*Id.*)  Coleman asked the deputies to keep an

3    accurate count because someone was going to have to pay for the damages and the collective was

4    not going to be able to fulfill its contracts without the plants.  (*Id.*)  The deputies laughed and

5    completed the destruction of the plants.  (*Id.*)  By Coleman's count, the deputies destroyed 287

6    plants, which amounts to a loss of about $1.9 million.  (*Id.*)  As the deputies were leaving,

7    Nunnelley told Coleman, "You need to move.  Your kind isn't wanted here in Shasta County."

8    (*Id.*)  Coleman responded, "What 'kind' are you referring to?"  (*Id.*)  Estes then interjected,

9    "Dude, let's go!  Don't answer that question."  (*Id.*)  Coleman asserts that based on the way

10   Nunnelley said this comment and Estes's reaction, he is sure Nunnelley was referring to

11   Coleman's race/skin color.  (*Id.* at 8–9.)

12       **II.     PROCEDURAL BACKGROUND**

13   Coleman and MC Health (the medical marijuana collective that contracted with Coleman

14   to grow marijuana on the property) filed the operative First Amended Complaint ("FAC") on July

15   28, 2017.  (ECF No. 9.)  Plaintiffs allege: (1) a 42 U.S.C. § 1981 claim; (2) a 42 U.S.C. § 1982

16   claim; (3) a 42 U.S.C. § 1983 claim based on Fourth, Fifth, and Fourteenth Amendment

17   violations; (4) a California Civil Code § 51 ("Unruh Act") claim; (5) a California Civil Code § 52

18   ("Bane Act") claim; (6) a trespass to land claim; (7) an invasion of privacy claim; (8) a

19   conversion claim; (9) an intentional infliction of emotional distress claim; (10) a negligent

20   infliction of emotional distress claim; and (11) an interference with contractual advantage claim.[4]

21   (*Id.*)  Defendants filed the instant motion for summary judgment on April 1, 2021.  (ECF No. 35.)

22       **III.    STANDARD OF LAW**

23   Summary judgment is appropriate when the moving party demonstrates no genuine issue

24   of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

25   R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary

26   judgment practice, the moving party always bears the initial responsibility of informing the

27   ───────────────

28   [4]     The Court previously dismissed the negligent infliction of emotional distress claim (Claim
     Ten) without leave to amend.  (ECF No. 23 at 9.)

                                          6

1   district court of the basis of its motion, and identifying those portions of "the pleadings,

2   depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

3   which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v.*

4   *Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof

5   at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

6   solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at

7   324 (internal quotation marks omitted). Indeed, summary judgment should be entered against a

8   party who does not make a showing sufficient to establish the existence of an element essential to

9   that party's case, and on which that party will bear the burden of proof at trial.

10       If the moving party meets its initial responsibility, the burden then shifts to the opposing

11   party to establish that a genuine issue as to any material fact does exist. *Matsushita Elec. Indus.*

12   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv.*

13   *Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute,

14   the opposing party may not rely upon the denials of its pleadings but is required to tender

15   evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

16   support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must

17   demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the

18   suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that

19   the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for

20   the nonmoving party. *Id.* at 251–52.

21       In the endeavor to establish the existence of a factual dispute, the opposing party need not

22   establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

23   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

24   trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is

25   to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

26   trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's

27   note on 1963 amendments).

28   ///

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  To show a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. at 587.

**IV.   ANALYSIS**

Defendants move for summary judgment on all of Plaintiffs' claims.  (ECF No. 35-1.)  The Court will address Defendants' arguments as to each claim in turn.

A.   Claims One and Two

In Claim One, Plaintiffs allege a 42 U.S.C. § 1981 ("§ 1981") claim against all Defendants.  (ECF No. 9 at 9–10.)  Section 1981 "prohibits racial discrimination in the making and enforcement of private contracts."  *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).  In Claim Two, Plaintiffs allege a 42 U.S.C. § 1982 ("§ 1982") claim against all Defendants.  (ECF No. 9 at 10.)  Section 1982 prohibits private racial discrimination in the sale or rental of real or personal property.  *Runyon*, 427 U.S. at 170.  The Court will first address Defendants' arguments as to the claims against the individual deputies and then as to the claims against County.

i.   *Individual Deputies*

Defendants move for summary judgment as to Claims One and Two against the individual deputies because there is no evidence of racial discrimination.  (ECF No. 35-1 at 18.)  More specifically, Defendants argue the deputies did not know Coleman's race when they entered his property or when they first suspected there was an illegal marijuana grow.  (*Id.*)  Defendants

8

1   further argue there is no evidence the outcome would have been different had Plaintiff been

2   white.  (*Id.*)

3        The Court disagrees with Defendants and concludes there are genuine issues of material

4   fact as to whether the deputies knew Coleman's race and acted with discriminatory intent.  As

5   already discussed in detail, the parties provide conflicting evidence about almost everything that

6   occurred after Robert Schooley removed the gate to the easement.  Regardless of whether the

7   deputies knew Coleman was Black prior to entering his property, it can hardly be said that the

8   deputies did not know Coleman was Black after speaking to him in person at the front door.

9        There is conflicting evidence about whether the deputies acted unlawfully after that point.

10   For example, the parties provide conflicting evidence about whether Coleman verbalized his

11   consent for the search of his property.  (ECF No. 37-1 at 12, 16.)  In addition, while Defendants

12   argue Nunnelley formed suspicion of the outdoor marijuana grow by walking around the yard

13   before Coleman answered the door, Coleman's declaration suggests the deputies spoke to

14   Coleman (and therefore knew he was Black) *before* Nunnelley walked around the yard area.

15   (ECF No. 37-4 at 6 ("[O]nce Deputy Estes mentioned 'marijuana,' Deputy Nunnelley started

16   going around the side of my house.").)  Coleman's declaration also indicates Nunnelley would

17   not have been able to see or smell any outdoor marijuana — a direct and material dispute of

18   Nunnelley's representation that he *could* see and smell marijuana.  (*Id.*)  Lastly, there is a dispute

19   as to whether Nunnelley told Coleman they did not want "your kind" in the County after

20   searching the property and destroying the marijuana plants.  Although Defendants contend

21   Nunnelly's statement referred to the County's distaste for marijuana growers, a reasonable jury

22   could conclude that "your kind" referred to Coleman's race and that Nunnelly's statement and

23   Estes's quick reaction showed that the deputies' preceding actions were motivated by racial

24   animus.  The trier of fact should resolve these factual disputes and credibility determinations.  *See*

25   *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) ("[W]e must respect the exclusive province of

26   the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw

27   reasonable inferences from proven facts.") (internal quotation marks and brackets omitted).

28   ///

1    Viewing the evidence in Plaintiffs' favor provides a reasonable inference the deputies

2  knew Coleman was Black before searching his premises and discriminated against him based on

3  his race.  For these reasons, the Court DENIES Defendants' motion for summary judgment as to

4  Claims One and Two against the individual deputies.

5                              *ii.*          *The County*

6    Defendants also argue Plaintiffs cannot prevail on Claims One and Two against the

7  County because there is no evidence the County had a deliberate policy that encourages officers

8  to engage in "biased-based policing."  (ECF No. 35-1 at 19.)

9    A plaintiff bringing a §§ 1981 or 1982 claim against a municipality must allege that his

10  injury was caused by an official "policy or custom" as set forth in *Monell v. Dep't of Soc. Servs.*

11  *of City of N.Y.*, 436 U.S. 658 (1978).  *Fed'n of African Am. Contractors v. City of Oakland*, 96

12  F.3d 1204, 1205 (9th Cir. 1996).  To bring a *Monell* claim, Plaintiffs must establish that "the local

13  government had a deliberate policy, custom, or practice that was the 'moving force' behind the

14  constitutional violation [they] suffered."  *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007).

15    Without citing any evidence, Plaintiffs argue the County can be held liable because the

16  deputies acted with deliberate indifference.  (ECF No. 37 at 15.)  Plaintiffs cite *Allen v. Cnty. of*

17  *Lake*, 71 F. Supp. 3d 1044, 1055 (N.D. Cal. 2014).  (*Id.*)  Plaintiffs' reliance on *Allen* is

18  unpersuasive.  The cited section of *Allen* broadly explains that "a municipality can be liable

19  where its officers demonstrate 'deliberate indifference' to plaintiffs' constitutional rights."  71 F.

20  Supp. 3d at 1055 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989)).  Plaintiffs

21  do not argue a failure to train theory and instead seem to argue the County is liable because the

22  deputies acted with "deliberate indifference" in this particular case.  However, the Ninth Circuit

23  has long held that a single incident will not suffice for *Monell* liability.  *Christie v. Iopa*, 176 F.3d

24  1231, 1235 (9th Cir. 1999).  A plaintiff must show a longstanding practice or custom which

25  constitutes the standard operating procedure of the local government entity.  *See Trevino v. Gates*,

26  99 F.3d 911, 918 (9th Cir. 1996).  "The custom must be so 'persistent and widespread' that it

27  constitutes a permanent and well settled city policy."  *Id.* (quoting *Monell*, 436 U.S. at

28  691).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it

1   must be founded upon practices of sufficient duration, frequency and consistency that the conduct

2   has become a traditional method of carrying out policy." *Id.*

3       Plaintiffs also argue — again without citing any evidence — that Defendants acted under

4   a policy, custom, or ratification of behavior when they denied Plaintiffs' rights because the

5   County provides white marijuana growers with alternative procedures to avoid abatement.  (*Id.*)

6   In their separate statement, Plaintiffs cite to Shasta County Code Enforcement Officer Marc

7   Pelote's deposition from a separate state court proceeding to support the contention that "White

8   people found in violation of the Shasta County Ordinance allowing for the growing of medical

9   marijuana are not criminally charged; instead, their violations are handled as civil public

10  nuisance/abatement matters."  (ECF No. 37-1 at 17.)  Defendants object to this evidence, arguing

11  it is improper to take judicial notice of testimony from a separate court proceeding.  (ECF No. 39-

12  1 at 3.)  Even if the Court were to consider this evidence over Defendants' objection, however,

13  the Court cannot locate any statement within the cited portions of Pelote's deposition[5] that

14  supports the contention that the County has a policy, custom, or practice of treating marijuana

15  growers differently based on race.

16      In sum, Plaintiffs fail to provide evidence that a County policy, custom, or practice was

17  the "moving force" behind the deputies' alleged racial discrimination.  *Whitaker*, 486 F.3d at 581.

18  For their part, Defendants provide evidence that the County has policies and rules that prohibit

19  "bias-based policing."  (ECF No. 37-1 at 15.)

20      Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

21  Claims One and Two against the County.

22          B.    Claim Three

23      In Claim Three, Plaintiffs allege a 42 U.S.C. § 1983 ("§1983") claim against all

24  Defendants.  (ECF No. 9 at 10–12.)  Section 1983 "provides a cause of action for the 'deprivation

25  of any rights, privileges, or immunities secured by the Constitution and laws' of the United

26  States." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  The two essential elements a

27

28  [5]    Plaintiffs cite 337:21—379:19 of Pelote's deposition, which appears to be improperly cited as Pelote's deposition begins at page 354, not 337.

1  plaintiff must establish for a § 1983 claim are as follows: "(1) that a right secured by the

2  Constitution or laws of the United States was violated[;] and (2) that the alleged violation was

3  committed by a person acting under the color of State law."  *Id.*  Plaintiffs allege Defendants

4  violated Plaintiffs' Fourth Amendment rights to be free from unreasonable search and seizure and

5  Plaintiffs' Fifth and Fourteenth Amendment rights by taking Plaintiffs' property without due

6  process or just compensation.  (ECF No. 9 at 12.)  The Court will discuss each alleged

7  constitutional violation in turn.

8                      *i.       Fourth Amendment*

9         The Fourth Amendment provides in relevant part that "[t]he right of the people to be

10  secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

11  shall not be violated."  U.S. Const. amend. IV.  "The Fourth Amendment does not proscribe all

12  state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida*

13  *v. Jimeno*, 500 U.S. 248, 250 (1991); *Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003).

14         Defendants argue officers may "approach a home to contact the inhabitants" while passing

15  through the curtilage without violating the Fourth Amendment.  (ECF No. 35-1 at 19.)

16  Defendants further argue Robert Schooley appeared to the deputies to have common ownership of

17  the driveway easement and consented to the deputies using the driveway to contact Coleman.

18  (*Id.*)  Defendants also argue there is no evidence to support a claim against the County for these

19  violations.  (*Id.* at 21.)  Lastly, Defendants argue they are entitled to qualified immunity.  (*Id.*)

20         As discussed, there are genuine disputes of material fact bearing on whether the deputies

21  acted unconstitutionally.  Viewing the evidence in the light most favorable to Plaintiffs, a

22  reasonable juror could find that it was unreasonable for the deputies to believe the Schooleys had

23  authority to invite the deputies onto the easement (much less onto Coleman's property on the

24  northern lot), especially because it is undisputed that the Schooleys informed the deputies of a

25  property dispute and were locked out of the easement when the deputies arrived.  (ECF No. 37-1

26  at 5.)  There is also conflicting evidence about whether Nunnelley could have determined there

27  was marijuana being grown illegally once the deputies arrived on Coleman's property.  (ECF No.

28  37-4 at 6.)  Even if Nunnelley could see and smell marijuana growing from a legal vantage point,

1    Defendants fail to persuade the Court that deputies were justified in proceeding in their

2    subsequent actions without a warrant.  *See Katz v. United States*, 389 U.S. 347, 357 (1967)

3    ("[S]earches conducted outside the judicial process, without prior approval by judge or

4    magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few

5    specifically established and well-delineated exceptions.").  Moreover, as discussed, there is

6    conflicting evidence about whether Coleman consented to the warrantless search of his property.

7    (ECF No. 37-1 at 12, 16.)

8        These factual disputes preclude summary judgment and a finding of qualified immunity.

9    *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 709–10 (9th Cir. 2017) (denying qualified immunity

10   at summary judgment where fact and credibility issues were to be decided by a jury); *Espinosa v.*

11   *City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment

12   on qualified immunity because "there are genuine issues of fact regarding whether the officers

13   violated [the plaintiff's] Fourth Amendment rights[, which] are also material to a proper

14   determination of the reasonableness of the officers' belief in the legality of their actions").

15       Defendants also argue Plaintiffs' *Monell* claim against the County fails.  (ECF No. 35-1 at

16   21.)  Defendants cite evidence indicating that the County trains its deputies on legal methods for

17   entry onto private property, how to conduct searches and seizures, and when warrants are

18   required.  (*Id.*)  In opposition, Plaintiffs do not cite any evidence and state only that "[t]he

19   analysis as to the County under [§] 1983 is the same as that above with respect to §§ 1981 and

20   1982."  (ECF No. 37 at 16.)  For the same reasons already discussed in the context of the §§ 1981

21   and 1982 claims, the Court concludes there is no genuine issue of material fact as to the County's

22   liability under *Monell*.  In short, Plaintiffs fail to present evidence — or make any argument — to

23   establish that a County policy, custom, or practice was the "moving force" behind the deputies'

24   alleged Fourth Amendment violations.  *Whitaker*, 486 F.3d at 581.

25       Thus, Defendants' motion for summary judgment is DENIED as to Plaintiffs' Claim

26   Three against the individual deputies based on Fourth Amendment violations and GRANTED as

27   to Claim Three against the County for those violations.

28   ///

13

1                *ii.*        *Fifth and Fourteenth Amendments*

2      The Takings Clause of the Fifth Amendment prohibits the government from taking

3 "private property . . . for public use, without just compensation." U.S. Const. amend. V. To

4 assert a claim under the Takings Clause, "a plaintiff must first demonstrate that he possesses a

5 'property interest' that is constitutionally protected." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d

6 1194, 1198 (9th Cir. 1998). State law, as well as federal law, can create a property interest. *See*

7 *id.* at 1200–01. However, although "state law creates a property interest, not all state-created

8 rights rise to the level of a constitutionally protected interest." *Brady v. Gebbie*, 859 F.2d 1543,

9 1548 n.3 (9th Cir. 1988).

10      Under the Fourteenth Amendment, "[n]o state shall . . . deprive any person of life, liberty,

11 or property, without due process of laws." U.S. Const. amend. XIV. To establish a procedural or

12 substantive due process claim, a plaintiff must first show "a liberty or property interest protected

13 by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix.*, 24 F.3d 56, 62 (9th Cir.

14 1994) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)); *Kraft v. Jacka*, 872 F.2d 862,

15 866 (9th Cir. 1989)). Although state law creates property interests, *see Little v. Gore*, 148 F.

16 Supp. 3d 936, 955 (S.D. Cal. 2015) (quoting *Samson v. City of Bainbridge Island*, 683 F.3d 1051,

17 1057 (9th Cir. 2012)), "federal constitutional law determines whether that interest rises to the

18 level of a legitimate claim of entitlement protected by the Due Process Clause." *Id.* (quoting

19 *Memphis Light Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978); *Samson*, 683 F.3d at 1057;

20 *Lawson v. Umatilla Cnty.*, 139 F.3d 690, 692 (9th Cir. 1998)).

21      Defendants argue Plaintiffs' Fifth and Fourteenth Amendment claims fail because there is

22 no federally protected property interest in marijuana. (ECF No. 35-1 at 20.) In opposition,

23 Plaintiffs acknowledge courts have found there is no constitutional right to cultivate marijuana

24 and these claims "might therefore fail." (ECF No. 37 at 16.)

25      Courts within this district have clarified that marijuana is contraband per se under federal

26 law and thus no person can have a cognizable federal legal interest in it, notwithstanding that it is

27 legal to grow and/or possess marijuana under California law under certain circumstances. *See,*

28 *e.g.*, *Evans v. Cnty. of Trinity*, No. 2:18-CV-00083-TLN-JDP, 2021 WL 516796, at *3 (E.D. Cal.

1   Feb. 11, 2021); *Barrios v. Cnty. of Tulare*, No. 1:13-CV-1665 AWI GSA, 2014 WL 2174746, at

2   *5 (E.D. Cal. May 23, 2014); *Schmidt v. Cnty. of Nevada*, No. 2:10-CV-3022 FCD/EFB, 2011

3   WL 2967786, at *5 (E.D. Cal. July 19, 2011).  Plaintiffs fail to cite to any Ninth Circuit authority

4   to the contrary.

5          Because Plaintiffs have not shown they have a cognizable property interest in marijuana,

6   Plaintiffs' Fifth and Fourteenth Amendment claims against the deputies fail as a matter of law.

7   Absent an underlying constitutional violation, these claims also fail as brought against the

8   County.  *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) ("[A] municipality .

9   . . [cannot] be held liable under § 1983 where no injury or constitutional violation has occurred.").

10         Therefore, the Court GRANTS Defendants' motion for summary judgment as to Claim

11  Three against all Defendants based on Fifth and Fourteenth Amendment violations.

12                         C.      Claim Four

13         In Claim Four, Plaintiffs allege a violation of the Unruh Act.  (ECF No. 9 at 14.)  The

14  Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and

15  no matter what their . . . race . . . are entitled to the full and equal accommodations, advantages,

16  facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal.

17  Civ. Code § 51(b).  The California Supreme Court has held that the term "business establishment"

18  should be construed "in the broadest sense reasonably possible."  *Isbister v. Boys' Club of Santa*

19  *Cruz, Inc.*, 40 Cal. 3d 72, 78 (1985) (internal quotation marks omitted); *McGee v. Poverello*

20  *House*, No. 1:18-cv-00768-LJO-SAB, 2019 WL 5596875, at *4 (E.D. Cal. Oct. 30, 2019).

21         Defendants argue Plaintiffs' Unruh Act claim fails for two reasons: (1) there is no

22  evidence Defendants discriminated against Plaintiffs; and (2) Defendants are not a "business

23  establishment" within the meaning of the Unruh Act.  (ECF No. 35-1 at 23.)

24         As to Defendants' first argument, the Court has already found there is sufficient evidence

25  of racial discrimination to preclude summary judgment on that basis.  As to Defendants' second

26  argument, Plaintiffs argue the County should be considered a "business establishment" because it

27

28

                                                    15

provides services available to the public.[6]  (ECF No. 37 at 17.)  Plaintiffs solely rely on *Bohlke v. California*, No. C-06-1667 MMC, 2006 WL 2355395, at *3 (N.D. Cal. Aug. 15, 2006).  (*Id.*)  In *Bohlke*, the court found "the DMV qualifies as a business establishment for the purposes of the Unruh Act . . . [because] the DMV's services are available to members of the public, who voluntarily visit the DMV for the purposes of obtaining drivers' licenses and related services." 2006 WL 2355395, at *3.  Unlike the services provided by the DMV, Defendants were not engaged in what could be considered a business transaction with Plaintiffs.  *Id.* at *2 (explaining that the Unruh Act "firmly established the right of all persons to nondiscriminatory treatment by establishments that engage in business transactions with the public") (citation omitted).  Plaintiffs do not cite — nor can the Court locate — any authority suggesting that Defendants act as a "business establishment" when conducting the type of law enforcement tasks at issue here, which do not involve any "commercial" or "businesslike attributes."  *See Carter v. City of L.A.*, 224 Cal. App. 4th 808, 825 (2014); *see also H.M. v. Cnty. of Kern*, No. 1:20-CV-1339-JLT-BAK-BAM, 2022 WL 1625183, at *6 (E.D. Cal. May 23, 2022) ("[C]ourts have declined to impose liability under the Unruh Act when the alleged wrongful acts did not relate to a *business* function") (emphasis in original).  Plaintiffs fail to cite any evidence or adequately develop arguments to demonstrate that Defendants act as a business establishment in any context, much less in the context of a law enforcement investigation.  Based on the limited argument presented, Plaintiffs fail to persuade the Court that Defendants can be held liable as a "business establishment" under the Unruh Act in these circumstances.

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Claim Four.

---

[6]    In denying Defendants' previous motion to dismiss the Unruh Act claim, the Court expressed doubt about the viability of the claim because Plaintiffs argued that their medical marijuana collective was a "business establishment" for Unruh Act purposes.  (*See* ECF No. 23 at 8 ("Plaintiffs do not bring a typical Unruh Act claim in that Plaintiffs do not allege discrimination *by* the business establishment . . . [b]ut Defendants do not raise this issue in their motion, and the Court is not inclined to address it *sua sponte*.") (emphasis in original).)  Plaintiffs appear to have abandoned that position in their opposition to the instant motion and now argue Defendants are the "business establishment" under the Unruh Act.

1            D.     Claim Five

2          In Claim Five, Plaintiffs allege a violation of the Bane Act.  (ECF No. 9 at 14–16.)  The

3  Bane Act provides for liability when someone, "by threat, intimidation, or coercion," interferes

4  with "rights secured by the Constitution or laws of the United States" or those of California.  *See*

5  Cal. Civ. Code § 52.1(b).  The Bane Act does not require a showing of "threat, intimidation or

6  coercion" independent from the constitutional violation alleged.  *See Reese v. Sacramento*, 888

7  F.3d 1030, 1043 (9th Cir. 2018).  However, the Ninth Circuit has held that the Bane Act requires

8  a defendant to have had a specific intent to violate the plaintiff's protected rights.  *Id.*

9          Defendants argue the Bane Act claim fails because there is no evidence Defendants had a

10  specific intent to violate Plaintiffs' constitutional rights.  (ECF No. 35-1 at 24.)  In opposition,

11  Plaintiffs do not cite evidence or case law and instead assert only that "[a]s discussed above, there

12  surely is such evidence."  (ECF No. 37 at 17.)

13          The basis for Plaintiffs' Bane Act is unclear.  Looking at the FAC, it appears the Bane Act

14  claim is based only on constitutional violations related to the unlawful search and seizure.  (*See*

15  ECF No. 9 at 14–16.)  There is no further clarification or discussion about the Bane Act claim in

16  Plaintiffs' opposition.  By only incorporating prior argument, Plaintiffs' opposition is essentially

17  non-responsive and does not establish that Defendants had the necessary specific intent.  *See*

18  *Cobarrubia v. Edwards*, No. 4:19-CV-07899-KAW, 2021 WL 4846948, at *3 (N.D. Cal. June 4,

19  2021) (noting the plaintiff's failure to respond to the defendant's argument on a particular issue

20  constituted abandonment of that issue).

21          Absent any evidence or argument establishing that Defendants had the specific intent to

22  violate Plaintiffs' constitutional rights, the Court GRANTS Defendants' motion for summary

23  judgment as to Claim Five.

24            E.     Claim Six

25          In Claim Six, Plaintiffs allege trespass to land.  (ECF No. 9 at 16.)  "The essence of the

26  cause of action for trespass is an unauthorized entry onto the land of another."  *Donahue Schriber*

27  *Realty Grp., Inc. v. Nu Creation Outreach*, 232 Cal. App. 4th 1171, 1177–78 (citing *Cassinos v.*

28  *Union Oil Co.*, 14 Cal. App. 4th 1770, 1778 (1993)) (internal quotation marks omitted).  "The

1    elements of trespass are: (1) the plaintiff's ownership or control of the property; (2) the

2    defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for

3    the entry or acts in excess of permission; (4) harm; and (5) the defendant's conduct was a

4    substantial factor in causing the harm." *Ralphs Grocery Co. v. Victory Consultants, Inc.*, 17 Cal.

5    App. 5th 245, 262 (2017).

6         Defendants argue Plaintiffs' trespass to land claim fails because the deputies were invited

7    onto the property.  (ECF No. 35-1 at 25.)  Defendants further argue they are immune from

8    liability under California Government Code §§ 821.8 and 820.2.  (*Id.*)

9         The Court has already found there are genuine disputes of material fact as to whether the

10   deputies lawfully entered Coleman's property.  Those factual disputes also preclude a finding that

11   the deputies are immune under § 821.8, which allows for immunity only if the entry is "expressly

12   or impliedly authorized by law."  Cal. Gov't Code § 821.8.  In addition, § 820.2, which creates

13   immunity for discretionary decisions, is inapplicable as it "applies only to policy decisions, not

14   operational decisions" like the deputies' decision to conduct the search and seizure.  *Mendez v.

15   Cnty. of L.A.*, 897 F.3d 1067, 1084 (9th Cir. 2018) (citing *Caldwell v. Montoya*, 10 Cal. 4th 972,

16   981 (1995)).

17        Therefore, the Court DENIES Defendants' motion for summary judgment as to Claim Six.

18        F.    Claim Seven

19        In Claim Seven, Plaintiffs allege invasion of privacy.  (ECF No. 9 at 16–17.)  "To state a

20   claim for violation of the constitutional right of privacy, a party must establish: (1) a legally

21   protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and

22   (3) a serious invasion of the privacy interest."  *Moreno v. Hanford Sentinel, Inc.*, 172 Cal. App.

23   4th 1125, 1129 (2009).

24        Defendants argue Plaintiffs' invasion of privacy claim fails because Plaintiffs "cannot

25   have an objective entitlement to privacy when they share a driveway easement with a neighbor."

26   (ECF No. 35-1 at 26.)  Defendants further argue the Schooleys had a possessory right in the

27   easement and Plaintiffs "all but invited the call to the Sheriff's Department by engaging in

28   ongoing disputes and locking the gate."  (*Id.*)  In addition, Defendants argue they are immune

1    from liability under California Government Code §§ 821.8 and 820.2.  (*Id.*)

2         Defendants' arguments are unpersuasive.  Defendants fail to cite case law to support the

3    contention that Plaintiffs lost their expectation of privacy by virtue of sharing an easement with

4    the Schooleys or by engaging in property disputes.  There is no evidence to suggest the easement

5    gave the Schooleys or anyone else unrestricted access to Plaintiffs' property on the northern lot.

6    To the contrary, a reasonable juror could find that the ongoing property disputes and Coleman's

7    efforts to lock the gate to the easement strengthen his reasonable expectation of privacy.  Further,

8    as with the trespass claim, neither §§ 821.8 nor 820.2 provide immunity for liability under these

9    circumstances.

10        Thus, the Court DENIES Defendants' motion for summary judgment as to Claim Seven.

11             G.    Claim Eight

12        In Claim Eight, Plaintiffs allege conversion.  (ECF No. 9 at 17–18.)  "Conversion is the

13   wrongful exercise of dominion over the property of another.  The elements of a conversion claim

14   are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's

15   conversion by a wrongful act or disposition of property rights; and (3) damages."  *Welco*

16   *Electronics, Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014) (internal quotation marks omitted).

17        Defendants argue the conversion claim fails because Plaintiffs did not lawfully possess the

18   marijuana.  (ECF No. 35-1 at 26.)  Defendants cite evidence to support the contention that

19   Plaintiffs were not in compliance with the relevant Shasta Code Ordinances that prohibited

20   outdoor growing of marijuana and limited indoor grows to 12 plants.  (*Id.*)  In opposition,

21   Plaintiffs argue only that medical marijuana plants are presumed to be personal property —

22   apparently incorporating the arguments they made as to the Fifth and Fourth Amendment claims.

23   (ECF No. 37 at 19.)  Plaintiffs do not address Defendants' argument that they did not lawfully

24   possess the marijuana plants under Shasta County Ordinances.  (*See id.*)

25        Plaintiffs' conversion claim requires them to show that they were in lawful possession of

26   the marijuana.  *Schmidt*, 808 F. Supp. 2d at 1253 (citing *Moore v. Regents of Univ. of Cal.*, 51

27   Cal. 3d 120, 136 (1990)); *see also Snowden v. Cnty. of Valaveras*, No. 1:18-CV-01595-DAD-

28   SAB, 2019 WL 4829480, at *8 (E.D. Cal. Sept. 30, 2019) ("plaintiff's state law conversion claim

1   fails to state a claim because she has not alleged facts that, if proven, would establish that she had

2   a legal right to possess the seized marijuana") (citation and internal quotation marks omitted).

3   Plaintiffs have failed to do so.  For their part, Defendants provide ample evidence that Plaintiffs'

4   possession of marijuana was illegal under Shasta County Ordinances.

5          Thus, the Court GRANTS Defendants' motion for summary judgment as to Claim Eight.

6          H.      Claim Nine

7          In Claim Nine, Plaintiffs allege intentional infliction of emotional distress ("IIED").  (ECF

8   No. 9 at 18.)  An IIED claim requires: (1) extreme and outrageous conduct by the defendant with

9   the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2)

10  the plaintiff suffering severe or extreme emotional distress; and (3) actual and proximate

11  causation of the emotional distress by the defendant's outrageous conduct. *Hughes v. Pair*, 46

12  Cal. 4th 1035, 1050 (2009).  "A defendant's conduct is outrageous when it is so extreme as to

13  exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal quotation

14  marks omitted).

15         Defendants argue the IIED claim fails because the deputies' conduct was not extreme or

16  outrageous.  (ECF No. 35-1 at 27.)  In opposition, Plaintiffs assert — without citing any evidence

17  or case law — "there is a reasonable inference that the deputies intentionally engaged in a

18  warrantless search and seizure of Mr. Coleman's property because he was a black man and they

19  capped it off with a threatening racial slur."  (ECF No. 37 at 19.)

20         Even if the Court accepts Plaintiffs' argument, the deputies' conduct was not "so extreme

21  as to exceed all bounds of that usually tolerated in a civilized community." *Hughes*, 46 Cal. 4th

22  at 1050.  As such, Plaintiffs' IIED claim fails as a matter of law because no reasonable jury could

23  find that the deputies engaged in extreme and outrageous conduct.

24         Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Claim

25  Nine.

26         I.      Claim Eleven

27         In Claim Eleven, Plaintiffs allege interference with contractual advantage.  (ECF No. 9 at

28  18–19.)  To prevail on this claim, Plaintiffs must establish the following: "(1) a valid contract

20

1  between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's

2  intentional acts designed to induce a breach or disruption of the contractual relationship; (4)

3  actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas*

4  *and Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990); *Gardner v. Shasta Cnty.*, No.

5  2:06-cv-0106-MCE-DAD, 2007 WL 3243847, at *6 (E.D. Cal. Nov. 1, 2007).

6       Defendants argue this claim fails because the deputies were unaware that Plaintiffs had

7  existing contractual relations with a third party.  (ECF No. 35-1 at 28.)  In opposition, Plaintiffs

8  cite Coleman's declaration, which states Coleman asked the deputies to keep an accurate count of

9  the plants they were destroying because he was going to be unable to fulfill his contracts with

10  medical marijuana patients.  (ECF No. 37 at 19.)  Coleman further states the deputies laughed in

11  response and completed the destruction of the plants.  (*Id.*)

12       The Court agrees with Plaintiffs that this evidence is sufficient to raise a genuine dispute

13  of material fact as to whether the deputies were aware Plaintiffs had existing contractual relations

14  with third parties.  For the first time in reply, Defendants argue there is no evidence the deputies

15  knew the specific details of the contracts that would give the deputies the requisite intent to harm

16  the contracts.  (ECF No. 39 at 15.)  Defendants cite *Davis v. Nadrich*, 174 Cal. App. 4th 1, 10–11

17  (2009), to support their position but do not provide any meaningful analysis of the case.  (*Id.*)

18  Based on the Court's review, it appears *Davis* is factually distinct and does not hold that

19  Defendants must know the precise details of Plaintiffs alleged contracts to bring an interference

20  with contract claim.  The Court finds Plaintiffs' evidence provides at the very least a reasonable

21  inference that the deputies knew Plaintiffs had contracts with third parties, knew the contracts

22  involved providing those third parties with marijuana, and knew destroying the marijuana plants

23  would interfere with those contracts.

24       Therefore, the Court DENIES Defendants' motion for summary judgment as to Claim

25  Eleven.

26  ///

27  ///

28  ///

## V.   CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment (ECF No. 35) as follows:

1. The Court DENIES Defendants' motion as to Claims One and Two against Estes and Nunnelley;

2. The Court GRANTS Defendants' motion as to Claims One and Two against the County;

3. The Court DENIES Defendants' motion as to Claim Three against Estes and Nunnelley for Fourth Amendment violations;

4. The Court GRANTS Defendants' motion as to Claim Three against Estes and Nunnelley for Fifth and Fourteenth Amendment violations;

5. The Court GRANTS Defendants' motion as to Claim Three against the County;

6. The Court GRANTS Defendants' motion as to Claim Four;

7. The Court GRANTS Defendants' motion as to Claim Five;

8. The Court DENIES Defendants' motion as to Claim Six;

9. The Court DENIES Defendants' motion as to Claim Seven;

10. The Court GRANTS Defendants' motion as to Claim Eight;

11. The Court GRANTS Defendants' motion as to Claim Nine; and

12. The Court DENIES Defendants' motion as to Claim Eleven.

The parties are ORDERED to file a Joint Status Report not later than thirty (30) days of the electronic filing date of this Order indicating their readiness to proceed to trial and proposing trial dates.

IT IS SO ORDERED.

**DATE: December 7, 2022**

Troy L. Nunley
United States District Judge